UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LATONYA CLARKE
*ADMINISTRATRIX* of
the ESTATE OF ADRIAN AZEKIEL MACK,

   Plaintiff,

v.              Case No.: 3:20cv_____
                **JURY TRIAL DEMANDED**

HAROLD CLARKE,
In his individual capacity

LIEUTENANT CREGER
In his individual capacity

SERGEANT BOURNE
In his individual capacity

OFFICER ALEXANDER
In her individual capacity

OFFICER ROGERS
In her individual capacity

and

JOHN DOE CORRECTIONAL OFFICERS
In their individual capacities,

   Defendants.

## COMPLAINT

  Plaintiff Latonya Clarke as *Administratrix* of the Estate of Adrian Azekiel Mack ("Plaintiff"), by counsel, moves for judgment against Defendants Harold Clarke, in his individual capacity ("Mr. Clarke"); Lieutenant Creger, in his individual capacity; Sergeant Bourne, in his individual capacity, Officer Alexander, in her individual capacity; Officer Rogers, in his individual

1

capacity; and John Doe Correctional Officers, in their individual capacities (collectively, "Defendants").

## JURISDICTIONAL STATEMENT

1. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) over Plaintiff's 42 U.S.C. § 1983 claims asserted herein.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

3. Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## PARTIES

4. Plaintiff is the *Administratrix* of the Estate of Adrian Azekiel Mack ("Mr. Mack"). Plaintiff is, and has at all relevant times has been, a resident of the Commonwealth of Virginia. Plaintiff brings this wrongful death action pursuant to Virginia Code § 8.01-50.

5. At all relevant times, Mr. Clarke was the director of the Virginia Department of Corrections ("VDOC") and was responsible for all oversight, operation, and administration of the Commonwealth of Virginia's correctional system, including providing access to adequate medical treatment and the formulation of policies that ensure the provision of that access to adequate medical treatment to Mr. Mack and those similarly situated. Mr. Clarke is being sued in his individual capacity. At all times relevant, Mr. Clarke was responsible for knowing all applicable laws regarding medical treatment of inmates under VDOC's care, custody, and control.

6. At all relevant times, Lieutenant Creger was a correctional officer employed by VDOC and acting in a supervisory capacity at Baskerville Correctional Center.

7. At all relevant times, Sergeant Bourne was a correctional officer employed by VDOC and acting in a supervisory capacity at Baskerville Correctional Center.

8. At all times relevant, Officer Alexander was a correctional officer employed by VDOC and working at Baskerville Correctional Center.

9. At all relevant times, Officer Rogers was a correctional officer employed by VDOC and working at Baskerville Correctional Center.

10. At all relevant times, John Doe Correctional Officers were employed by VDOC and working at Baskerville Correctional Center.

11. Lieutenant Creger, Sergeant Bourne, Officer Alexander, Officer Rogers, and the John Doe Correctional Officers are referred to in this Complaint collectively as the "Officer Defendants."

## FACTUAL ALLEGATIONS

*Mr. Mack Had Significant Medical Needs That Were Well Known to the Correctional and Medical Staff at Baskerville Correctional Center*

12. On or about February 15, 2019, Mr. Mack was incarcerated at Baskerville Correctional Center.

13. Intake screening records from VDOC prepared on or before February 15, 2019, indicate that Mr. Mack had had a history of asthma since childhood. VDOC also possessed medical records from a period of incarceration of Mr. Mack well before February 15, 2019 that Mr. Mack suffered from asthma.

14. At all relevant times, Baskerville Correctional Center lacked air conditioning in the housing unit where Mr. Mack was incarcerated.

15. At all times relevant, Baskerville Correctional Center failed to maintain any trained medical staff onsite from 6:00 p.m. to approximately 7:00 a.m. on any day of the week, and a physician was only available onsite approximately once per week for a few hours.

16. On March 25, 2019, Mr. Mack was evaluated by one of the nurses at Baskerville Correctional Center because of complaints regarding his asthma.

17. On April 21, 2019, Mr. Mack was evaluated by one of the nurses at Baskerville Correctional Center because he was experiencing wheezing and other symptoms from his asthma. Mr. Mack was provided Chlor-Trimeton as treatment.

18. In the evening of April 27, 2019, Mr. Mack experienced a significant asthma attack and Lieutenant Creger called Laurie Hightower ("Ms. Hightower"), a Licensed Practical Nurse then employed at Baskerville Correctional Facility, at home and left a voicemail seeking guidance for handling Mr. Mack's condition. Ms. Hightower responded that Mr. Mack should visit "sick call" when possible. At "sick call" on April 28, 2019, Mr. Mack reported that he had experienced difficulty breathing over the past week, and one of the nurses at Baskerville Correctional Center scheduled Mr. Mack for a visit with a physician at a later date. The treating nurse noted that she heard wheezing on the left side of Mr. Mack's lungs. Subsequently, Mr. Mack received a Xopenex inhaler to treat his asthma, but that inhaler eventually ran out.

19. On May 25, 2019, Mr. Mack experienced another severe asthma attack and advised a fellow inmate, Rishard Whitaker ("Mr. Whitaker"), that he was having extreme difficulty breathing. Mr. Whitaker alerted Officer Alexander almost immediately after learning of Mr. Mack's breathing difficulties. Mr. Whitaker then ran back to attempt to assist Mr. Mack.

20. The guards on duty in Mr. Mack's assigned pod during the incident giving rise to this Complaint, Lieutenant Creger, Sergeant Bourne, Officer Alexander, and Officer Rogers, were

well aware of Mr. Mack's history of asthma, including his recent difficulties breathing and bouts of wheezing.

21. In response to the alert by Mr. Whitaker, none of the guards on duty took action commensurate with the seriousness of Mr. Mack's medical emergency.

22. Approximately fifteen minutes later, Sgt. Bourne arrived at Mr. Mack's location in the housing unit. At this point, Mr. Mack was unable to stand without assistance from Mr. Whitaker and another inmate, Mario Henley ("Mr. Henley"). The guard observed the situation and asked questions of Mr. Henley and Mr. Whitaker for approximately five minutes before directing Mr. Whitaker and Mr. Henley to carry Mr. Mack to the infirmary.

23. Upon arrival to the infirmary, Mr. Mack was drooling and largely unresponsive and his fingertips were purple and cold to the touch. Mr. Whitaker and Mr. Henley observed that the infirmary was outfitted with an oxygen tank and mask and asked the attending guards to provide Mr. Mack with supplemental oxygen. One of the guards responded that no one was trained to use the oxygen tank and mask, so no oxygen therapy could be provided to Mr. Mack.

24. None of the guards on duty effected any substantive emergency treatment to Mr. Mack before or after he arrived at the infirmary.

25. Approximately twenty minutes after Mr. Mack reached the infirmary, one of the guards called 911 to request an ambulance. The closest rescue squad to Baskerville Correctional Center is Southside Rescue Squad, Inc. ("Southside Rescue") at 810 W. Atlantic Street, South Hill, Virginia 23970. It takes Southside Rescue at least fifteen minutes to travel from its headquarters in South Hill to Baskerville Correctional Center.

26. The failure to contact 911 immediately upon the alert from Mr. Whitaker is inexplicable.

27. None of the guards on duty acted promptly to contact 911, as required by VDOC policies and procedures in light of the seriousness of Mr. Mack's medical emergency.

28. Because of security systems, policies, and procedures in place at Baskerville Correctional Center, it took approximately seven minutes after arriving on scene for Southside Rescue to reach Mr. Mack in the infirmary. Such a delay for Southside Rescue in reaching critically ill inmates is practically unavoidable because of Baskerville Correctional Center's systems, policies, and procedures.

29. Upon reaching Mr. Mack, Southside Rescue noted that Mr. Mack "was found being held up in a chair, foaming at mouth, and apnic respiration." Southside Rescue further observed that Mr. Mack scored the minimum score of three on the Glasgow coma scale, which indicates deep coma or a brain-dead state.

30. None of the emergency treatments administered by Southside Rescue succeeded in resuscitating Mr. Mack from his dire condition.

31. Upon Mr. Mack's arrival at VCU Health Community Memorial Hospital in South Hill, Dr. Christopher J. Alexander supervised CPR, which was unsuccessful, and declared Mr. Mack dead after an ultrasound revealed no cardiac activity at 8:15 p.m.

32. VDOC Operating Procedure Number 720.7 provides, in pertinent part, as follows:

> I. PURPOSE
>
> The Department of Corrections has the responsibility to ensure that incarcerated offenders have unimpeded access to health care services on a 24 hour basis. This operating procedure provides guidance for ensuring adequate emergency medical equipment is available in areas where needed and that each facility has provisions and resources identified for provision of emergency medical care including transport to off-site medical facilities if needed. (2-CO-3B-02)
>
> IV. PROCEDURE
>
>   A. Emergency Medical Equipment
>
>     1. Each facility is responsible for the identification, acquisition, and maintenance of necessary basic equipment to provide health care in emergency situations.
>
>     2. Minimum emergency medical equipment requirements for all facilities are:
>
>       a. Oxygen

> B. Emergency Medical Care
>
> 1. Each facility will ensure 24-hour emergency medical services are available and that complaints are handled immediately; that adequate first aid kits and emergency medical supplies are available and perpetually inventoried; and that facilities provide for on-site emergency first aid, CPR, and crisis intervention.
>
> 2. Each facility shall provide emergency medical care within the available resources to all employees, visitors, offenders, and other persons on facility property. Incidents resulting in mass injuries may require implementation of facility emergency plans and the Incident Command System (see Operating Procedure 075.1, *Emergency Operations Plan*)
>
> 3. Staff members are expected to take appropriate and immediate action when called upon in medical emergencies, providing care within the scope of their training.
>
> 4. Staff training for medical emergencies is established by recognized health authorities (American Heart Association), and presented in accordance with Department of Criminal Justice Services and DOC requirements to cover: (4-ACRS-4C-04)
>    a. Health care staff shall be certified in CPR with certification documentation and training logs maintained in the Medical Department.
>    b. All health care staff in the facility are trained in the implementation of the facility's emergency plans. Health care staff are included in facility emergency drills, as applicable. (4-4388)
>    c. Other staff should be trained in CPR, first aid, and use of the automatic external defibrillator (AED) to include:
>       i. Signs, symptoms, and action required in potential medical emergencies
>       ii. Methods of obtaining assistance
>       iii. Signs and symptoms of mental illness, retardation, and chemical dependency
>       iv. Procedures for patient transfers to appropriate medical facilities or health-care providers
>    d. Locations of first aid kits, AED's, and other emergency medical equipment should be communicated to all staff.
>
> 5. Designated correctional and all health care staff are trained to respond to health-related situations within a four-minute response time. The training program is conducted on an annual basis and is established by the responsible health authority in cooperation with the facility or program administrator and includes instruction on the following: (4-4389)
>    a. Recognition of signs and symptoms, and knowledge of action required in potential emergency situations
>    b. Administration of basic first aid
>    c. Certification in cardiopulmonary resuscitation (CPR) in accordance with the recommendations of the certifying health organization
>    d. Methods of obtaining assistance
>    e. Signs and symptoms of mental illness, violent behavior, and acute chemical intoxication and withdrawal
>    f. Procedures for patient transfers to appropriate medical facilities or health care providers
>    g. Suicide intervention
>
> 6. Each facility will have a written plan for 24-hour medical, dental, and mental health services availability. (4-4351, 4-ACRS-4C-03)

33. Following Mr. Mack's death, the Office of the Chief Medical Examiner of the Virginia Department of Health (the "Chief Medical Examiner") performed an autopsy of Mr. Mack's body and a death investigation, which determined that the Mr. Mack's cause of death was status asthmaticus, i.e., "an extreme form of asthma exacerbation characterized by hypoxemia,

hypercarbia, and secondary respiratory failure." R. Chakraborty and S. Basnet, *Status Asthmaticus* (Mar. 25, 2020), available at https://www.ncbi.nlm.nih.gov/books/NBK526070/ (last accessed on Dec. 30, 2020).

34. At the request of the Chief Medical Examiner, the Virginia Department of Forensic Science performed a toxicology examination of iliac blood from Mr. Mack's body. This examination determined that no alcohol or mood-altering drugs were in Mr. Mack's system at the time of his death.

### *Life Saving Care for Mr. Mack and a Call to 911 Were Inexplicably Delayed*

35. Sergeant Bourne failed to arrive at Mr. Mack's location for approximately fifteen minutes after Mr. Whitaker alerted Officer Alexander that Mr. Mack was having severe difficulty breathing.

36. Even after arriving at Mr. Mack's location and observing that Mr. Mack was in dire condition, Sergeant Bourne wasted precious time questioning Mr. Whitaker and Mr. Henley about Mr. Mack's condition. Mr. Mack was unable to speak at this time. Approximately five minutes elapsed before Sergeant Bourne instructed Mr. Whitaker and Mr. Henley to carry Mr. Mack to the infirmary.

37. Mr. Whitaker and Mr. Henley moving Mr. Mack to the infirmary failed to effectuate emergency treatment for Mr. Mack because no officers on-site were able to provide basic emergency medical care to Mr. Mack. For example, as set forth above, none of the officers "assisting" Mr. Mack were able to administer supplemental oxygen to Mr. Mack even though the infirmary was equipped with an oxygen tank and mask. The Officer Defendants lacked basic training which would have facilitated the provision of life-saving emergency medical care to Mr. Mack, as required by VDOC Operating Procedure Number 720.7.

38.     As set forth above, Mr. Mack's fingertips were cold to the touch and purplish in color when he arrived at the infirmary.

39.     Inexplicably, the Officer Defendants delayed another twenty minutes before calling Southside Rescue.

40.     When Southside Rescue arrived, the Officer Defendants initially would not allow the EMTs to administer emergency treatment because Mr. Mack was not restrained.

### *VDOC's Unconstitutional Policy or Custom of Deliberate Indifference and Failure to Train Its Officers to Provide Basic Emergency Medical Care Caused Mack's Death*

41.     Baskerville Correctional Center has a policy or custom of failing to maintain any trained medical staff onsite from 6:00 p.m. to 7:00 a.m. on any day of the week.

42.     Presumably, the decision to fail to maintain any trained medical staff from 6:00 p.m. to 7:00 a.m. seven days a week was a costs-savings measure, as there is no other discernible reason to cut medical staffing by 100% in the evenings and early morning hours in a correctional facility where the medical needs of inmates are not contingent on the time of day.

43.     The inmate population at Baskerville Correctional Center, and consequently proportionate potential for serious medical needs of inmates at Baskerville Correctional Center was no different between 6:00 p.m. and 7:00 a.m. as opposed to 7:00 a.m. to 6:00 p.m.

44.     Accordingly, Mr. Clarke knew that failing to maintain any trained medical staff onsite between 6:00 p.m. and 7:00 a.m. was completely inadequate to deal with inmate medical issues, but that it in fact created an unreasonable, foreseeable, and unnecessary risk of harm to inmates with serious medical needs. As shown by Mr. Mack's completely unnecessary death, Baskerville Correctional Center was unequipped even to respond to an entirely predictable asthma attack.

45. In this case, Mr. Clarke's policy or custom of deliberate indifference to the medical needs of Mr. Mack by its failure to maintain any staff with medical training after 6:00 p.m. on May 25, 2019 directly and proximately contributed to Mr. Mack's death insofar as this staffing failure resulted in:

   a. Severely delayed response to Mr. Mack's emergent medical needs, resulting in his unresponsive and dire condition upon his arrival to the infirmary;

   b. Inexplicable delay in calling 911, resulting in Mr. Mack's deep coma or brain death prior to the arrival of Southside Rescue at Baskerville Correctional Center; and

   c. The failure to administer supplemental oxygen to Mr. Mack, who was in respiratory distress from asthma, which is an essential emergency treatment for an individual suffering an asthma attack.

### *The Officer Defendants' Deliberate Indifference Caused Mack's Death*

46. The Officer Defendants repeatedly failed to take appropriate action commensurate with the seriousness of Mr. Mack's medical emergency.

47. At all times after Mr. Whitaker alerted the Officer Defendants to Mr. Mack's breathing difficulties on May 25, 2019, the Officer Defendants knew that Mr. Mack was experiencing breathing difficulties, which, in and of itself, constitutes a medical emergency, which, given the conditions at Baskerville Correctional Center and the lack of trained medical staff onsite, could only be properly and safely assessed, diagnosed, and treated in an emergency room.

48. At all times on May 25, 2019, the Officer Defendants knew that the most expedient way, and, the only practical way, to procure hospital care for Mr. Mack was to call 911 on Mr. Mack's behalf. The Officer Defendants further knew that delaying such are would be likely to cause Mr. Mack to suffer serious injury or death and that it took Southside Rescue at least fifteen

minutes to travel from its headquarters in South Hill to Baskerville Correctional Center. Yet, the Officer Defendants waited approximately forty (40) minutes to call 911 after learning that Mr. Mack was experiencing difficulty breathing.

49. The Officer Defendants further took no action to effect any emergency treatments to Mr. Mack other than calling 911 approximately forty (40) minutes after learning that Mr. Mack was experiencing a serious medical emergency.

50. The Officer Defendants refused to even attempt to administer supplemental oxygen to Mr. Mack even though the infirmary was equipped with an oxygen tank and mask.

## COUNT I
### 42 U.S.C. § 1983—Policy or Custom of Deliberate Indifference to the Serious Medical Needs of Inmates—Defendant Clarke

51. Plaintiff re-alleges and incorporates all other factual allegations of this Complaint, as if fully set forth herein.

52. Due to his policy or custom of inadequate staffing between 6:00 p.m. to 7:00 a.m. at Baskerville Correctional Center, Mr. Clarke maintained a policy or custom of deliberate indifference to the serious medical needs of inmates/detainees confined in at Baskerville Correctional Center.

53. Mr. Clarke's actions and inactions as described herein resulted in a policy or custom of deliberate indifference that was a "moving force" behind the failure to address Mr. Mack's serious medical needs, and resulting in his death.

54. In particular, the policy and custom of indifference to the serious need of adequate medical staffing in the evenings and early mornings resulted directly in (i) the severely delayed response to Mr. Mack's medical emergency; (ii) the inexplicable delay in officers at Baskerville Correctional Center calling 911, resulting in Mr. Mack's deep coma or brain death prior to the

arrival of Southside Rescue at Baskerville Correctional Center; and (iii) the failure to administer supplemental oxygen to Mr. Mack, who was in respiratory distress from asthma, which is an essential emergency treatment for an individual suffering an asthma attack.

55. Because of Mr. Clarke's policy or custom of indifference, Baskerville Correctional Center's lack of medical staff in the evening and early morning posed a recognizable and patent risk to the health and safety of inmates/detainees, including Mr. Mack.

56. Mr. Clarke had direct and specific knowledge of the constitutionally inadequate medical staffing at Baskerville Correctional Center from 6:00 p.m. to 7:00 a.m. He knew this staffing was not adequate as evinced, in part, by the significantly increased staffing during the weekdays.

57. Mr. Clarke's official policy or custom of deliberate indifference to the serious medical needs of inmates/detainees at Baskerville Correctional Center was a direct proximate cause of Mr. Mack's death.

58. Mr. Clarke's acts and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Mr. Mack's constitutional rights, such that Plaintiff is entitled to recover punitive damages.

59. WHEREFORE, Mr. Clarke's violations of the Fourteenth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983 for monetary relief consisting of compensatory and/or punitive damages in the amount to be established at trial, and attorneys' fees and costs, and as further set forth in the "Damages" section below.

## COUNT II
### 42 U.S.C. § 1983—Deliberate Indifference to the Serious Medical Need of Mr. Mack—All Defendants

60. Plaintiff re-alleges and incorporates all other factual allegations of this Complaint, as if fully set forth herein.

61. The Officer Defendants were deliberately indifferent to Mr. Mack's serious medical needs and unconstitutionally delayed providing him necessary medical care so as to cause him substantial harm in multiple ways including (but not limited to):

   a. Severe delay in responding to Mr. Mack's emergent medical needs, resulting in his unresponsive and dire condition upon his arrival to the infirmary;

   b. Inexplicable delay in calling 911, resulting in Mr. Mack's deep coma or brain death prior to the arrival of Southside Rescue at Baskerville Correctional Center; and

   c. Failing to administer supplemental oxygen to Mr. Mack, who was in respiratory distress from asthma, which is an essential emergency treatment for an individual suffering an asthma attack.

62. WHEREFORE, Defendants' violations of the Fourteenth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983 for monetary relief consisting of compensatory and/or punitive damages in the amount to be established at trial, and attorneys' fees and costs, and as further set forth in the "Damages" section below.

## COUNT III
### 42 U.S.C. § 1983—Failure to Train—Defendant Clarke

63. Plaintiff re-alleges and incorporates all other factual allegations of this Complaint, as if fully set forth herein.

64. At all times relevant to this action, Mr. Clarke had a duty to properly to properly hire, train, supervise, and fire, if necessary, VDOC personnel in order to provide inmates at

Baskerville Correctional Center with access to basic emergency medical care, as reflected in VDOC Operating Procedure Number 720.7.

65. Mr. Clarke failed to effectively train, supervise, and control officers under his purview regarding the appropriate provision of basic emergency medical care, as required by VDOC Operating Procedure Number 720.7.

66. As evident from the facts above, Mr. Clarke has a policy, custom, or practice of failing to effectively train, supervise, discipline, and control officers under his supervision regarding the appropriate provision of basic emergency medical care, as required by VDOC Operating Procedure Number 720.7.

67. Mr. Clarke knew or should have known that officers at Baskerville Correctional Center required adequate training on the proper administration of basic emergency medical care.

68. Mr. Clarke violated his duty to properly train officers at Baskerville Correctional Center on the proper administration of basic emergency medical care.

69. In violating that duty, Mr. Clarke demonstrated a deliberate indifference to the need for proper training of officers at Baskerville Correctional Center in the proper administration of basic emergency medical care.

70. Because Mr. Clarke violated his duty to properly train officers at Baskerville Correctional Center in the administration of basic emergency medical care, the Officer Defendants violated Mr. Mack's constitutional rights by delaying the provision of basic emergency medical care to Mr. Mack.

71. WHEREFORE, Mr. Clarke's violations of the Fourteenth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983 for monetary

relief consisting of compensatory and/or punitive damages in the amount to be established at trial, and attorneys' fees and costs, and as further set forth in the "Damages" section below.

## DAMAGES

72. As a direct and proximate result of the tortious conduct by all Defendants set forth *supra*, Mr. Mack's Estate has suffered the following compensable damages pursuant to Virginia Code § 8.01-52:

   a. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices, and advice of the decedent;

   b. Compensation for reasonably expected loss of (i) income of the decedent and (ii) services, protection, care, and assistance provided by the decedent;

   c. Reasonable funeral expenses; and

   d. Punitive damages for willful or wanton conduct, or such recklessness as evinces a conscious disregard for the safety of others.

WHEREFORE, based upon the foregoing, Plaintiff demands judgment against Defendants for compensatory damages to be set at trial, together with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees and expenses.

WHEREFORE, Defendants' conduct having been so willful, wanton, and/or reckless as to evince a conscious disregard for the rights of others, Plaintiff demands the award of punitive damages against Defendants in a just amount to be established at trial, together with prejudgment and post-judgment interest, and allowable costs incurred.

WHEREFORE, Plaintiff seeks such further and additional relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED.**

                                            Respectfully Submitted,

                                            _/s/ Drew D. Sarrett_
                                        Drew D. Sarrett (VSB No. 81658)
                                        The Sarrett Law Firm PLLC
                                        8100 Three Chopt Road, Suite 203
                                        Richmond, Virginia 23229
                                        (804) 303-1951
                                        (804) 250-6005 (facsimile)
                                        drew@sarrettlawfirm.com

                                        Andrew Lucchetti (VSB No. 86631)
                                        Halperin Law Center, LLC
                                        5225 Hickory Park Drive, Suite B
                                        Glen Allen, VA 23059
                                        (804) 527-0100
                                        (866) 335-1502 (facsimile)
                                        andrew@halperinlegal.com
                                        *Counsel for Plaintiff*